**EFiled: Jan 29 2025 10:30AM EST**
**Transaction ID 75534673**
**Case No. 2024-0457-SEM**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF RHODE ISLAND OFFICE OF THE GENERAL TREASURER, ON BEHALF OF THE EMPLOYEES' RETIREMENT SYSTEM OF RHODE ISLAND, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024-0457-SEM |
| PARAMOUNT GLOBAL, | ) ) | |
| Defendant. | ) ) | |

## OPINION ADDRESSING STOCKHOLDER'S PROPER PURPOSE

Date Submitted: November 14, 2024
Date Decided: January 29, 2025

Michael Hanrahan, Corinne Elise Amato, Eric J. Juray, Stacey A. Greenspan, Jason W. Rigby, Seth T. Ford, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Lee D. Rudy, Eric L. Zagar, Grant D. Goodhart, Cameron N. Campbell, Michael W. McCutcheon, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Counsel for Plaintiff.*

Jon E. Abramczyk, D. McKinley Measley, Alexandra M. Cumings, Louis F. Masi, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jonathan K. Youngwood, Meredith Karp, SIMPSON THACHER & BARTLETT LLP, New York, New York; *Counsel for Defendant.*

**LASTER, V.C.**

A stockholder seeks books and records to explore possible corporate wrongdoing. The corporation argues that the stockholder cannot establish a proper purpose.

The corporation claims that a controlling stockholder steering bidders away from a company-level transaction and toward a parent-level transaction cannot give rise to a fiduciary breach. The Delaware Supreme Court has held otherwise. Investigating the possibility of disloyal steering constitutes a proper purpose.

The corporation argues that the stockholder cannot meet its burden because the stockholder relied on events and evidence post-dating the demand. On the facts of this case, the stockholder can rely on all of the post-demand evidence.

The corporation argues that the stockholder cannot meet its burden because the stockholder relied on news articles. The corporation is particularly adamant that a stockholder cannot rely on news articles that reference confidential sources absent corroborating evidence or particularized details about the source. On the facts of this case, the articles bear sufficient indicia of reliability to be considered.

The record as a whole demonstrates by a preponderance of the evidence that the stockholder has a credible basis to suspect wrongdoing. The stockholder is entitled to the books and records that are necessary to fulfill that purpose, stopping at what is sufficient for the stockholder's needs.

# I.   FACTUAL BACKGROUND

The parties agreed to a trial on a paper record comprising seventy-seven exhibits. The court has made the following findings of fact.[1]

## A.   The Company And Its Controller

Paramount Global ("Paramount" or the "Company") is a Delaware corporation.[2] The Company owns a portfolio of well-known media and entertainment assets, including Paramount Pictures (the "Studio"), CBS Television Network, streaming services, and cable networks.

The Company has two classes of publicly traded common stock. The Class A shares carry voting rights. The Class B shares do not. National Amusements, Inc. ("NAI") controls the Company through its ownership of Class A shares carrying a supermajority of the Company's voting power. Shari Redstone controls NAI and serves as its Chairman and CEO. Through her control over NAI, she controls the Company.

---

[1] Citations in the form "Dkt. __" refer to docket entries. Citations in the form "JX __ at __" refer to joint trial exhibits; page citations refer to the last three digits of the control or JX number. Citations in the form "AB at __" refer to Defendant Paramount Global's Answering Brief in Opposition to Plaintiff's Exceptions to Magistrate's Post-Trial Final Report.

[2] The Company's name is indeed just "Paramount Global." Ordinarily, the name of a corporation must "contain 1 of the words 'association,' 'company,' 'corporation,' 'club,' 'foundation,' 'fund,' 'incorporated,' 'institute,' 'society,' 'union,' 'syndicate,' or 'limited,' (or abbreviations thereof, with or without punctuation), or words (or abbreviations thereof, with or without punctuation) of like import of foreign countries or jurisdictions (provided they are written in roman characters or letters)." 8 *Del. C.* § 102(a)(1). The Division of Corporations may waive that requirement. *Id.* In any event, the absence of a corporate signifier is not an error.

2

**B. The Company's Poor Performance**

Redstone created the Company in 2019 by merging two firms NAI controlled: CBS Corporation and Viacom, Inc. Redstone's advisors projected that the deal would create a highly profitable company and generate $1 billion in synergies.

The Company failed to meet expectations. Facing financial pressure, its board of directors (the "Board") cut the Company's dividend by 80% in May 2023. A *Wall Street Journal* story citing anonymous sources reported that the dividend provided NAI with its principal source of revenue and Redstone with her primary source of income. JX 16 at '001.

NAI also owed about $25 million annually in interest payments. JX 21 at '005. To alleviate a cash crunch, NAI sold preferred stock to a private equity firm in return for a $125 million investment (the "Preferred Stock"). JX 16 at '001–02.

**C. Redstone Explores A Sale Of NAI.**

By November 2023, it was an open secret on Wall Street that Redstone was exploring a sale of NAI. The *Wall Street Journal* reported in December 2023 that Redstone had been in discussions with Amazon, Apple, and Netflix and was in ongoing discussions with Skydance Media, a firm backed by RedBird Capital Partners. JX 18 at '001–02; JX 21 at '005. The *New York Post* reported that Skydance preferred to acquire specific Company assets like the Studio. JX 19 at '003. Another article reported that Warner Bros. approached the Company's CEO, Robert Bakish, about a transaction between Warner and the Company. JX 21 at '005–06.

On January 10, 2024, the *New York Post* reported that Redstone had circulated non-disclosure agreements to private equity firms. According to "a source briefed on

3

the process," Redstone was asking for as much as a 50% premium over market value. JX 22 at '001–02. The story further noted, according to "sources," that Redstone was seeking a fast deal with a private equity firm because NAI faced a $37.5 million interest payment in March on a $175 million loan from Wells Fargo. *Id.* at '002. The story commented that NAI's debt and the Preferred Stock made it a less attractive asset for private equity firms. *See id.*

A *Wall Street Journal* article reported that Skydance remained interested and expected to be able to pay more than a private equity firm because of anticipated synergies. "[C]iting sources familiar with the matter," the article reported that Skydance's CEO David Ellison had proposed an all-cash bid partially financed by Skydance investors, including billionaire Larry Ellison (the "Skydance Deal"). *See* JX 23 at '001–02. Relying on its sources, the article reported that Warner remained interested in a direct merger with the Company, but that the discussions had not advanced. *Id.* at '004.

**D.    Allen Bids For The Company.**

On January 31, 2024, the *Wall Street Journal* reported that media entrepreneur Byron Allen had bid $14.3 billion for the Company. JX 26 at '002. Allen proposed to pay $28.58 per Class A share and $21.53 per Class B share. Those figures implied a 32.75% premium for the Class A shares associated with voting control. *Id.* at '002. Both classes of shares traded up sharply. According to a later article in *Deadline*, a market observer speculated that the different treatment of the Class A and B shares might reflect "something that Shari has told people that she is going to need." JX 29 at '004.

On January 31, 2024, the *New York Post* reported that "a source close to the situation" said Skydance and Redstone were "close on price" on a deal to acquire NAI. JX 27 at '005. The same article reported that neither the Company nor NAI had shown interest in a deal with Allen. *Id.* at '002. Citing "two sources close to the situation," the article reported that the Board had formed a special committee (the "Special Committee"). *Id.* at '001. A Company press release later confirmed that development. JX 72 at '009, '014.

On February 16, 2024, *Bloomberg Law* reported that "according to more than a dozen interviews with people involved in the process," Redstone had been informally exploring a sale of NAI for several months. JX 30 at '004. The article cited "[e]xecutives close to the negotiations" who commented that "[a]fter years of avoiding overtures to buy the company, Redstone has finally been willing to listen." *Id.* at '009.

### E. Redstone Rejects Another Company-Level Bid.

On March 20, 2024, the *Wall Street Journal* reported that according to "people familiar with the situation," Apollo Global Management offered $11 billion for the Studio. JX 32 at '001. The article reported that Redstone preferred to sell the Company as a whole. *Id.* at '002. The offer for the Studio significantly exceeded the Company's market valuation, and the Company's shares traded up by 12%. *See id.* at '002; JX 33 at '002. That same day, the *Financial Times* cited sources who said Redstone was convinced that a whole-Company sale would generate the most value. JX 33 at '002.

On April 3, 2024, a story in *Variety* reported that the Special Committee rejected Apollo's Studio-only bid. JX 35 at '001. The same article reported that Apollo

subsequently bid $27 billion in cash for the Company as a whole, but the Special Committee declined to engage. *Id.* The article reported that instead, Redstone had entered into exclusive discussions with Skydance about acquiring NAI's controlling stake in the Company. *Id.* at '002. The report commented that it was "not clear why the company's special committee would have not considered Apollo's $27 billion bid for the entire company." *Id.* On the same day, the *Wall Street Journal* reported that the Board had agreed to engage in exclusive discussions with Skydance. JX 36 at '001.

## F.     The Demand

The Employees' Retirement System of Rhode Island owns stock in the Company. On its behalf, the Office of the General Treasurer of Rhode Island served a demand for books and records on April 5, 2024 (the "Demand"). JX 37. The Demand stated that the stockholder was "concerned that Shari Redstone and NAI have usurped Paramount's corporate opportunities" by channeling potential buyers toward a purchase of NAI or its controlling stake rather than a transaction with the Company. *Id.* at '008. The Demand sought to "investigat[e] this potential wrongdoing" and to evaluate "whether to seek equitable relief to ensure Shari Redstone and NAI do not profit from their wrongdoing." *Id.*

The Demand sought board-level and officer-level materials concerning (i) any actual, potential, or proposed sale, merger, or other business combination involving NAI, the Company, or any of the Company's assets, (ii) any committee of the Board empowered to evaluate such a transaction, and (iii) the adoption of change-in-control agreements for Company management. The Demand sought informal materials including emails and text messages. *Id.* '006–07.

6

## G. The Director Exodus

On April 5, 2024—the day of the Demand—the *Wall Street Journal* reported that the Skydance Deal was shaping up to be a two-step transaction: Skydance would first acquire NAI for $2 billion in cash, then the Company would acquire Skydance in an all-stock deal valued at around $5 billion. JX 38 at '002. The second step would require Special Committee approval. The same story reported that the Special Committee did not engage with Apollo over its $26 billion bid, purportedly because Apollo had not conducted diligence, and the directors were concerned about losing the Skydance bid. *Id.* at '003.

On April 10, 2024, citing "people familiar with the situation," the *Wall Street Journal* reported that four Company directors would step down, including three directors serving on the Special Committee. JX 40 at '001. The Company later confirmed the report in an SEC filing. *See* JX 44. The same story reported that at least one of the departing directors cited concerns about the Skydance Deal. JX 40 at '002. The *Wrap* reported two days later that many Company stockholders wrote to the Board expressing concern about potential breaches of fiduciary duty by Redstone. JX 42.

On April 26, 2024, citing an anonymous source, the *Wall Street Journal* reported that the Board was preparing to fire Bakish and install an executive committee, ostensibly because Bakish was exploring other alternatives and had clashed with Redstone over the Skydance Deal. JX 45 at '001, '004. The *Financial Times* noted that the firing took place just before Apollo allied with Sony Picture to submit a new bid. JX 46 at '003. The firing was a "stunning move" not only because

7

Bakish was regarded as a Redstone loyalist, but because it came just four days after the Company's annual proxy statement listed Bakish on the Company's slate for re-election. *See* JX 46 at '002; JX 44 at '007. Citing a source "familiar with the matter," the story said that Bakish had been "uncooperative" during the sales and clashed with Redstone. JX 46 at '002. The Company announced Bakish's firing three days later. JX 48 at '004.

**H.      The Section 220 Litigation**

On April 19, 2024, the Company responded to the Demand. The Company asserted that the Demand did not state a proper purpose and was overly broad. *See* JX 43 at '001. The Company rejected the Demand but offered to produce documents concerning the formation and mandate of the Special Committee. *Id.* at '004. Eleven days later, the stockholder filed this action. The Chancellor assigned the case to a magistrate judge. The Company answered the complaint on May 23, 2024.

**I.      Redstone Changes Her Mind.**

On May 2, 2024, the *Wall Street Journal* reported that according to "people familiar with the situation," Apollo and Sony submitted a joint offer letter. JX 52 at '001. The Company's shares traded up by 13%. *Id.* at '002.

On June 2, 2024, the *Wall Street Journal* reported that Skydance sweetened its offer for the non-voting stockholders and would pay a 26% premium for an undisclosed number of Company Class B shares. JX 57 at '001. The sweetened deal for the non-voting stockholders meant $300 million less for NAI. *See id.* at '002; JX 70 at '003.

8

After the Company and Skydance agreed on the principal terms, the Board's independent directors scheduled a meeting to formally consider the deal. JX 69 at '002. On June 12, 2024, the *Los Angeles Times* reported that Redstone changed her mind about the deal minutes before the meeting. Citing "seven people close to the situation who were not authorized to comment on internal discussions," the *Los Angeles Times* reported that the lowered consideration for Redstone plus Skydance's refusal to indemnify Redstone against stockholder lawsuits caused her change of heart. JX 69 at '002–03. The *Wall Street Journal* wrote a similar story based on its own sources. JX 65 at '002.

## J.     The Company Announces The Skydance Deal.

On July 2, 2024, NAI and Skydance reached a new preliminary agreement: NAI signed off on a go-shop for the Company, and the second-step merger would not be conditioned on approval by a majority of the non-Redstone stockholders, which reportedly had been a sticking point. JX 70 at '002. The cash consideration for NAI reportedly remained the same. *Id.* at '002.

On July 7, 2024, the Company formally announced that Skydance would acquire NAI for $2.4 billion, followed by a second-step merger between Skydance and the Company that valued Skydance at $4.75 billion. JX 72 at '008. Under the deal, the post-merger company committed to indemnify Redstone. JX 73 at '122–25.

The *Wall Street Journal*'s sister publication, *Barron's*, offered the following assessment of the deal: "National Amusements gets cashed out at a nice price, but the deal for public holders of the nonvoting stock is much less generous and most of any upside will go to Skydance." JX 75 at '005.

9

**K. The Bench Ruling**

On July 24, 2024, the magistrate judge conducted a trial on a paper record and recommended a ruling in the Company's favor. The magistrate judge credited the Company's argument that the stockholder had not established a sufficient evidentiary foundation to support a proper purpose for an investigation. The magistrate judge did not reach the scope of the investigation.

The stockholder took exceptions to the report. When a constitutional judicial officer considers exceptions to a magistrate judge's report, the constitutional judicial officer must conduct a *de novo* review of both the facts and law.[3] This decision conducts that *de novo* review.

## II. LEGAL ANALYSIS

To obtain books and records under Section 220(b),[4] a stockholder must establish by a preponderance of the evidence (i) its status as a stockholder, (ii) compliance with the form-and-manner requirements for making a demand, and (iii) a proper purpose for conducting the inspection.[5] The disputed issues in this case involve the proper purpose requirement. The Company claims the stockholder lacks a proper purpose because the stockholder has not identified a theoretically viable form of wrongdoing. The Company further claims that even if the stockholder might

---

[3] Ct. Ch. R. 144(b)(2); *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).

[4] 8 *Del. C.* § 220(b).

[5] *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 144 (Del. 2012).

10

have identified a type of conduct that could constitute corporate wrongdoing, the stockholder failed to carry its evidentiary burden to establish a credible basis to suspect corporate wrongdoing in this case.

## A. Whether The Stockholder Has Carried Its Conceptual Burden

The Company first asserts that the Demand failed to identify a conceptually viable form of wrongdoing. The Demand posits that Redstone and NAI inferably breached their duty of loyalty by steering bidders away from a Company-level transaction and toward an NAI-level transaction. Contrary to the Company's position, that scenario could involve breaches of the duty of loyalty and support a proper purpose.

A stockholder's desire to investigate wrongdoing is a proper purpose.[6] But to avoid "indiscriminate fishing expedition[s]," a bare allegation of possible waste, mismanagement, or breach of fiduciary duty, without more, will not entitle a stockholder to a Section 220 inspection.[7]

At the same time, however, a demand need not develop a fully articulated theory of corporate wrongdoing that could support an actionable claim. The Delaware Supreme Court has held that "although the actionability of wrongdoing can be a relevant factor for the Court of Chancery to consider when assessing the legitimacy

---

[6] *Seinfeld v. Verizon Commc'ns, Inc.,* 909 A.2d 117, 121 (Del. 2006).

[7] *Id.*

11

of a stockholder's stated purpose, an investigating stockholder is not required in all cases to establish that the wrongdoing under investigation is actionable."[8]

In reaching this conclusion, the justices rejected a line of Court of Chancery decisions that required a stockholder to articulate an actionable claim before obtaining books and records.[9] The Delaware Supreme Court had repeatedly exhorted stockholders to use Section 220 to obtain books and records *before* bringing a lawsuit. Obtaining books and records first allows a stockholder to evaluate whether to file suit and, if litigation is warranted, plead a claim that is more likely to be viable. It would put the cart before the horse to require a stockholder to state an actionable claim before the stockholder could obtain the books and records necessary to evaluate whether an actionable claim exists.

The Company seeks to put the cart back before the horse by insisting that the Demand articulate a conceptually viable legal theory. The Demand expresses concern that Redstone and NAI "have usurped Paramount's corporate opportunities" and engaged in other potential breaches of fiduciary duty. JX 37 at '007–08.

The Company fixates on the reference to a "corporate opportunity" and argues that a scenario in which a controlling stockholder could veto a potential transaction can never give rise to a corporate opportunity that the controlling stockholder could usurp. As the argument goes, Redstone could cause NAI to exercise its voting power

---

[8] *AmerisourceBergen Corp. v. Lebanon Cty. Empls.' Ret. Fund* (*AmerisourceBergen II*), 243 A.3d 417, 421 (Del. 2020).

[9] *Id.* at 437.

to block any Company-level transaction. Therefore, the Company never had a cognizable interest or expectancy in a Company-level deal.

Under *CERBCO*[10] and *Digex*,[11] the Company is correct about a specific claim for usurpation of corporate opportunity. Although the Company prioritizes *Digex*, *CERBCO* is more apposite and established the rule that *Digex* applied.

In *CERBCO*, George and Robert Erikson were directors, officers, and stockholders who controlled 56% of CERBCO's voting power. CERBCO controlled a majority of the voting power of Insituform East, Inc. A third party approached the Eriksons in their capacity as directors and officers of CERBCO to discuss acquiring Insituform East. The Eriksons steered the discussion toward buying their own interests in CERBCO as a means of gaining control of both CERBCO and Insituform East. Thorpe, a CERBCO shareholder, filed a derivative suit claiming that the Eriksons had diverted the opportunity to sell Insituform to themselves.[12]

The Delaware Supreme Court held that this scenario did not support a claim for usurpation of a corporate opportunity:

> In this case, it is clear that the opportunity was one in which the corporation had an interest. Despite this fact, CERBCO would never be able to undertake the opportunity to sell its EAST shares. Every economically viable CERBCO sale of stock could have been blocked by the Eriksons under § 271. Since the corporation was not able to take

---

[10] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (Del. 1996).

[11] *In re Digex, Inc. S'holders Litig.*, 789 A.2d 1176 (Del. Ch. 2000).

[12] *Id.* at 1190.

13

advantage of the opportunity, the transaction was not one which, considering all of the relevant facts, fairly belonged to the corporation.[13]

The *Digex* court followed *CERBCO* and reached the same conclusion.[14]

But that one conclusion was not the entirety of the *CERBCO* case. The Delaware Supreme Court still held that the Ericksons breached their duty of loyalty by steering the transaction from CERBCO to themselves:

> The shareholder vote provided by § 271 does not supersede the duty of loyalty owed by control persons, just as the statutory power to merge does not allow oppressive conduct in the effectuation of a merger. Rather, this statutorily conferred power must be exercised within the constraints of the duty of loyalty. In practice, the reconciliation of these two precepts of corporate law means that the duty of a controlling shareholder/director will vary according to the role being played by that person and the stage of the transaction at which the power is employed.[15]

The Delaware Supreme Court also explained that "[t]he fundamental proposition that directors may not compete with the corporation mandates the finding that the Eriksons breached the duty of loyalty."[16] The Delaware Supreme Court remanded the case for a determination of damages.[17]

---

[13] 676 A.2d at 442.

[14] *Digex*, 789 A.2d at 1191.

[15] *CERBCO*, 676 A.2d at 442 (citations omitted); *accord Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 845 (Del. 1987); *Ringling Bros.-Barnum & Bailey Combined Shows v. Ringling*, 53 A.2d 441, 447 (Del. 1947); *see generally* J. Travis Laster, *The Distinctive Fiduciary Duties That Stockholder Controllers Owe*, 20 N.Y.U. J.L. & Bus. 461 (2024).

[16] *Id.*

[17] *Id.* at 445.

14

In reaching this outcome, the Delaware Supreme Court rejected the Court of Chancery's assertion that despite being controlling stockholders, the Ericksons could vote their shares however they wished. As the *Digex* court noted, "*CERBCO* teaches that this power, held by the controlling shareholder, is not without limit. . . . [T]he exercise of that power is always constrained by the duty of loyalty."[18] The *Digex* decision applied the same rule, but denied a preliminary injunction where the evidence at the preliminary injunction stage did not suggest a breach.[19]

The Company thus has a valid point about the stockholder not identifying a viable corporate opportunity claim, but the Demand is not limited to that one theory. The Demand references that claim but speaks generally about wrongdoing and breach of duty. Under *CERBCO* and *Digex*, Redstone and NAI could have engaged in disloyal conduct by channeling potential buyers away from a Company-level transaction and into an NAI-level transaction.

A demand does not have to articulate a specific legal theory. A demand has to explain why the stockholder has a credible basis to suspect wrongdoing. Here, the Demand describes a situation that could give rise to breaches of the duty of loyalty. The Demand properly seeks to investigate whether wrongful conduct occurred. The Company's conceptual objection to the Demand's purpose is misguided.

---

[18] *Digex*, 789 A.2d at 1191.

[19] *Id.* at 1992.

15

**B.** **Whether The Stockholder Carried Its Evidentiary Burden**

The Company's second argument contends that the stockholder failed to identify a sufficient evidentiary basis to support its articulated purpose. That argument also fails.

To obtain books and records, a stockholder must "show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation . . . ."[20] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[21] "Under this standard, [the plaintiff] is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, [the plaintiff] must prove only that it is more likely than not that it is entitled to relief."[22]

Putting these propositions together, the stockholder need only establish by a preponderance of the evidence that there is a credible basis from which the court can infer a possibility of wrongdoing.[23] "A stockholder is not required to prove by a

---

[20] *Seinfeld*, 909 A.2d at 123.

[21] *Agilent Techs, Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (internal quotation marks omitted).

[22] *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

[23] *AmerisourceBergen II*, 243 A.3d at 426.

16

preponderance of the evidence that [wrongdoing] and mismanagement are actually occurring."[24] "A stockholder is also not required to show by a preponderance of the evidence that wrongdoing is probable."[25] When determining whether a stockholder has proven by a preponderance of the evidence that a credible basis exists to suspect potential wrongdoing, a court evaluates the evidence collectively.[26]

The "credible basis" standard is "the lowest possible burden of proof."[27] A plaintiff may meet it by making "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[28] The

---

[24] *Seinfeld*, 909 A.2d at 123 (internal quotation marks omitted); *accord City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 287 (Del. 2010) ("Such evidence need not prove that wrongdoing, in fact, occurred."); *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 565 (Del. 1997) ("The stockholder need not actually prove the wrongdoing itself by a preponderance of the evidence."); *id.* at 567 ("The actual wrongdoing itself need not be proved in a Section 220 proceeding, however."); *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 681 A.2d 1026, 1031 (Del. 1996) ("[Stockholders] are not required to prove by a preponderance of the evidence that waste and [mis]management are actually occurring.").

[25] *Lebanon Cty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *8 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417.

[26] *See, e.g.*, *In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196, at *11–14 (Del. Ch. Apr. 30, 2015) (collectively assessing a company founder's inside knowledge based on company emails, suspicious timing and magnitude of founder's trades, and the speed at which founder hit his monthly trading cap); *Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *4 (determining that plaintiff had identified a credible basis for demand under Section 220 based on evidence which included "numerous third-party media reports," "the noisy resignations of three board members," and a publicly announced "internal investigation").

[27] *Seinfeld*, 909 A.2d at 123.

[28] *Id.*; *accord Sec. First*, 687 A.2d at 568.

17

plaintiff may rely on circumstantial evidence. [29] The plaintiff also may rely on hearsay, as long as it is sufficiently reliable.[30]

The Company contends that the stockholder failed to create an evidentiary record sufficient to establish a credible basis to suspect wrongdoing. To the contrary, the stockholder carried its burden.

### 1. The Post-Demand Evidence

The first disputed evidentiary issue is whether a stockholder can rely on evidence about post-demand events to meet its evidentiary burden. The Company argues that a stockholder is limited to the evidence known to the stockholder at the time of the demand. As a general matter, a stockholder should be limited to the evidence identified in a demand or what the stockholder knew at the time of demand, because that constraint helps parties resolve Section 220 demands without judicial involvement. But there are settings when a stockholder can legitimately rely at trial on post-demand evidence, such as when a material event occurs after the demand but before trial and when the stockholder's reliance on those post-demand events does not prejudice the corporation.

The statutory procedures for Section 220 suggest that a petitioner should be able to rely on post-demand evidence about pre-demand events. Section 220(b) only

---

[29] *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014).

[30] *See Thomas & Betts*, 681 A.2d at 1032–33; *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at \*4 (Del. Ch. Apr. 28, 2004); *see also NVIDIA Corp. v. City of Westland Police & Fire Ret. Sys.*, 282 A.3d 1, 21–22 (Del. 2022).

18

requires that the demand "stat[e] the purpose" for the inspection.[31] Section 220(c)

provides that a stockholder who sues to enforce a demand must establish that "[t]he

inspection such stockholder seeks is for a proper purpose."[32] The statute does not

require that the stockholder cite evidence in its demand. The statutory procedure

appears to envision that the stockholder could submit a relatively abbreviated

demand, produce evidence about the basis for the demand in discovery, and then

present that evidence at trial. Consistent with this view, Delaware decisions have

held that a petitioner may give testimony at trial to cure statements in the demand

about the stockholder's purpose.[33] But the cases also hold that a stockholder cannot

broaden its demand by adding new purposes after serving a demand.[34]

---

[31] 8 *Del. C.* § 220(b).

[32] *Id.* § 220(c)(3).

[33] *See, e.g.*, *Rodgers v. Cypress Semiconductor Corp.*, 2017 WL 1380621, *6 (Del. Ch. Apr. 17, 2017), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019); *Nottingham P'rs v. Trans-Lux Corp.*, 1987 WL 7534, at *1 (Del. Ch. Feb. 4, 1987); *Hatleigh Corp. v. Lane Bryant, Inc.*, 428 A.2d 350, 352 (Del. Ch. Feb. 5, 1981); *Odyssey P'rs. v. Trans World Corp.*, 1983 WL 18011, at *2 (Del. Ch. Mar. 29, 1983); *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 127 (Del. Ch. Mar. 21, 1969); *see generally* Donald J. Wolfe & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* § 9.07(e)(3) (2024) [hereinafter Wolfe & Pittenger] ("[M]any of the cases that have passed upon the specificity of the stated purpose as a matter of law have done so only after hearing the plaintiff's supplementing testimony at trial.").

[34] *NVIDIA*, 282 A.3d at 15 ("Delaware case law has held that Section 220 plaintiffs cannot broaden the scope of their requests throughout litigation, as such a change would be prejudicial to the corporate defendant."); *Fuchs Fam. Tr. v. Parker Drilling Co.*, 2015 WL 1036106, at *4 (Del. Ch. Mar. 4, 2015) (denying inspection demand because the plaintiff attempted to broaden its inspection request eight days before trial and after briefing); *see generally* Wolfe & Pittenger § 9.07(e)(3) ("[I]t has

19

The statutory structure likewise suggests that a corporation should be able to rely on post-demand evidence about the stockholder and its demand. Under the statute, a corporation can choose not to respond to a demand.[35] The statute treats a failure to respond as a rejection and does not suggest that the corporation waives any factual or legal arguments by failing to respond. Instead, the statute seems to contemplate that the corporation could obtain discovery from the stockholder and rely on that evidence at trial. Some defenses, such as an improper purpose defense, often require obtaining discovery from the stockholder.[36]

But with the Delaware courts encouraging stockholders to make demands under Section 220 before filing suit, the number of demands has increased. The judicial procedures that flesh out the operation of Section 220 should encourage extra-judicial resolution. If a stockholder must litigate based on a record limited to the purposes, evidence, and authorities identified in the demand, and if the corporation must defend against the demand based on the arguments and authorities identified in a response to the demand, then the parties will be better positioned to resolve

been held that a purpose that arises or becomes definite only after the demand has been made cannot support an action on the original demand.").

[35] *See* 8 *Del. C.* § 220(c).

[36] *E.g.*, *Wilkinson v. A. Schulman, Inc.*, 2017 WL 5289553, *2–3 (Del. Ch. Nov. 13, 2017) (finding the demand's purported purpose different from the stockholder's actual purpose after evaluating stockholder's deposition and the trial record); *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817–20 ("Such a showing [that the stockholder's stated purpose is not its actual purpose and its true purpose is improper] is fact intensive and difficult to establish.").

20

disputes without judicial involvement. When limited to that constrained record, the parties need not worry about new evidence or arguments being raised after litigation is filed, so they can better evaluate the likelihood that an inspection will be permitted and what it will encompass.

If a party could have secured the evidence to support an inspection before the Section 220 litigation was filed through the exercise of reasonable diligence, then it makes sense to bar the party from finding and introducing that evidence after the Section 220 proceeding ensues. By contrast, if the evidence relates to pre-demand events but could not have been obtained through the exercise of reasonable diligence before the Section 220 proceeding was filed, then the argument for not considering the evidence is less strong. The law could simply require the stockholder to make a new demand, but if the parties are already involved in litigation, then going back to the beginning for a do-over could be wasteful.

Evidence about events that occur after the demand presents different considerations. By definition, evidence about post-demand events could not be identified before the demand, suggesting parties should be able to rely on it. But permitting the introduction of evidence about any post-demand events could be prejudicial. One logical line would be to permit the introduction of evidence relating to action that the opposing party took. A party should not be surprised by evidence about its own acts, nor should the introduction of the evidence be prejudicial.

To support the proposition that a stockholder must have a credible basis at the time the demand is served without support from any post-demand evidence or events,

21

the Company cites a transcript ruling where a magistrate judge refused to consider documents the corporation produced voluntarily in response to the demand when assessing whether the stockholder had a credible basis for making the demand.[37] The case-specific outcome makes sense, but the report does not cite authority or formulate a broader principle that could be applied in other cases.

The other cases that the Company cites merely restate the need for the stockholders to establish a credible basis in a Section 220 proceeding. They do not address whether a stockholder can rely on later-acquired evidence. Each decision found that the evidence the stockholder provided was insufficient but did not address the timing issue.[38]

---

[37] *In re New Relic, Inc.*, C.A. No. 2023-1089-SEM, at 17–18 (Del. Ch. July 22, 2024) (TRANSCRIPT).

[38] *See Plumbers & Steamfitters Local Union No. 248 Pension Fund v. Wal-Mart Stores*, C.A. No. 7726-CS, at 9–12 (Del. Ch. May 20, 2013) (TRANSCRIPT) (holding that a 8-K disclosure about a judgment on the pleadings and a letter from two members of Congress on an *unpled* wrongdoing as the only pled basis is not sufficient to establish credible basis for investigating the pled wrongdoing); *Rudnick v. Chatham Cap. Corp.*, C.A. No. 3010-VCS, at 34–35 (Del. Ch. Mar. 12, 2008) (TRANSCRIPT) (restating the stockholders must prove credible basis to get inspection right); *Cutler v. Quiq, Inc.*, C.A. No. 6897-VCG, at 20 (Del. Ch. Feb. 24, 2012) (TRANSCRIPT) (ruling that "what you can't do is simply go on a fishing expedition for evidence of improper management to bolster your Section 220 action").

22

A decision that the parties did not cite states in a footnote that "a proper purpose cannot be established through post-demand conduct."[39] The decision cites two cases for that proposition, but neither supported the rule.

In the first case, the court struck testimony in which a stockholder relied on post-demand events to support its inspection.[40] The court reasoned that to consider the testimony would be prejudicial to the opposing party because the proffering party did not "make known its intention to rely on [the testimony about post-demand conduct] until the time of the trial" and it "made no supplemental demand and it did not seek to amend its pleadings."[41] The court also stated that it would have allowed the evidence if the company had notice or if "the action taken by [the company] was accomplished in such close proximity to the time of trial as might have excused [the stockholder] from complying with the spirit of § 220."[42] The court did not generally reject the introduction of post-demand evidence. The decision implies that reliance on post-demand evidence is acceptable if identified properly during the course of the litigation.

---

[39] *Wynnefield P'rs Small Cap Value L.P. v. Niagara Corp.*, 2006 WL 1737862, at *9 n.90 (Del. Ch. June 19, 2006), *aff'd in part on other grounds*, 907 A.2d 146 (Del. 2006) (TABLE).

[40] *AAR Corp. v. Brooks & Perkins, Inc.*, 1980 WL 6419, at *2 (Del. Ch. Aug. 12, 1980).

[41] *Id.*

[42] *Id.*

In the second case, the court denied a motion to compel production of post-demand amendments to the corporation's charter.[43] The court reasoned that the post-demand events "do not directly involve the alleged wrongdoing which production of the documents demanded under § 220 is designed to illuminate."[44] The ruling turned on relevance, not timing. On the question of timing, the court held that "the plaintiff may point to [post-demand event] (if relevant) to bolster her showing of proper purpose."[45] The decision did not generally reject the introduction of post-demand evidence. The decision implies that reliance on post-demand evidence is perfectly acceptable.

Although both decisions refused to consider evidence of post-demand events, the holdings were not based on the post-demand timing. They rested on prejudice and relevance.

This decision need not establish rules for all cases. The post-Demand evidence in this case comprises twenty-five post-Demand news reports, seven post-Demand SEC disclosures by the Company, and two litigation-related communications. Of these, seven news articles and three SEC disclosures predate the complaint.[46] The

---

[43] *Sutherland v. Dardanelle Timber Co., Inc.*, 2005 WL 1074357, at *1–2 (Del. Ch. Apr. 25, 2005).

[44] *Id.*

[45] *Id.* at *2.

[46] *See* JX 38; JXs 40–42; JXs 44–49.

24

rest predate the trial.[47] The post-Demand news articles all report on the Company's or Redstone's post-Demand actions. The Company's disclosures with the SEC generally confirm what the articles had said previously.[48]

The stockholder in this case could not have obtained the post-Demand evidence before the Demand. And when material events unfolded post-Demand, the stockholder promptly raised them during the litigation. The stockholder timely alleged the post-Demand director departures in its complaint and referenced the news articles as support.[49] The stockholder did not reference the Bakish firing in its complaint as the press reported on that event just one day before. But the stockholder promptly incorporated Bakish's firing in its pre-trial brief a month later.[50] The Company addressed these events in its pre-trial brief without objecting on the basis of prejudice.[51]

The evidence of post-Demand developments pertains to the Company's own conduct, so the Company cannot claim surprise. In fact, the Company relied on post-

---

[47] *See* JXs 50–52; JXs 56–66; JXs 69–75; JX 77.

[48] *See, e.g.*, JX 44 (disclosing the departure of four directors); JX 48 at '004 (announcing Bakish's firing); JX 72 at '009 (disclosing the formation of Special Committee four months before the Demand).

[49] Compl. ¶ 23 (citing JX 40, JX 41).

[50] Dkt. 21 at 4 n.14 (citing JX 47).

[51] *See* Dkt. at 20 n.3.

Demand events and cited seven post-Demand news articles in its own pre-trial brief.[52] In the pre-trial order, the parties stipulated to the occurrence of several post-Demand events, such as the Bakish termination and the announcement of the Skydance Deal.[53] The Company did not object to the use of this post-Demand evidence before the trial.[54] The use of post-Demand evidence in this case does not prejudice the Company.

In this case, the post-Demand evidence is not prejudicial to the Company because it concerns the Company's own acts. Excluding the evidence and requiring the stockholder to serve another demand would be wasteful. Therefore, the court will consider all of the post-Demand evidence submitted in this action.

### 2. The News Articles

The second dispute concerns the persuasiveness of the news articles the stockholder introduced. The stockholder's evidence to support a credible basis to suspect wrongdoing consisted predominantly of news articles, many of which relied on confidential sources. The Company argues that the news articles were unreliable hearsay. The Company also argues that articles relying on confidential sources are inherently unreliable absent factual particulars to assess their credibility. Those

---

[52] Dkt. 28 at 7 (citing JX 49); *id.* at 13 n.1 (citing JX 56, JX 63); *id* at 13–15 (citing JX 59, JXs 60–62); *id.* at 23 (citing JX 64).

[53] Dkt. 30 Ex. A at 2–3.

[54] Dkt. 30 Ex. B.

26

arguments fail. In this case, the news articles provide ample evidence to establish a credible basis to support wrongdoing.

### a. The Hearsay Issue

A stockholder can rely on hearsay to provide a credible basis to suspect wrongdoing, so long as the hearsay carries sufficient guarantees of trustworthiness.[55] The same is true in other areas of the law when a proceeding involves a lower evidentiary burden, such as a probable cause hearing, sentencing, and federal administrative proceedings.[56] Whether to credit hearsay evidence as sufficiently trustworthy is a question of fact.[57]

The Company argues that a stockholder cannot rely exclusively on news articles, citing *Louisiana Municipal Police Employees' Retirement System v. Lennar*

---

[55] *NVIDIA*, 282 A.3d at 21–22; *see also Thomas & Betts*, 681 A.2d at 1032–33; *Marmon*, 2004 WL 936512, at *4.

[56] *See, e.g.*, D.R.E. 1101(b)(2)–(4); Fed. R. Evid. 1101(d)(2), (3); *Richardson v. Perales*, 402 U.S. 389, 410 (1971) ("Hearsay, under either [Social Security Act or Administrative Procedure Act] is thus admissible up to the point of relevancy."); *United States v. Paulino*, 996 F.2d 1541, 1548 (3d Cir. 1993) (finding an agent's recounting of a conversation with "a reliable confidential informant" meets the "standard of minimum indicia of reliability").

[57] *Taylor v. Below*, 76 A.3d 791 (Del. 2013) ("A challenge to the credibility of the witness who heard the statements goes to the weight to be accorded to that evidence by the [factfinder], not to its admissibility." (internal quotation marks omitted)); *accord United States v. Weiner*, 578 F.2d 757, 770 (9th Cir. 1978) ("Once the judge determines that the hearsay evidence is admissible, the weight to be given that evidence becomes a question for the [factfinder]."), *cert. denied, Lichtig v. United States*, 439 U.S. 981 (1978).

27

*Corp.*[58] There, the stockholders seeking books and records relied on two *Wall Street Journal* articles reporting on an industry-wide government investigation. The Labor Department reportedly sent letters to companies in a particular industry asking them to provide basic labor and employment information for a Fair Labor Standards Act investigation[59] The first article identified Lennar Corp. as one of the companies that received a letter.[60] The second article, published a week later, explained that state regulators and the IRS planned to join the Department of Labor in conducting a broad "review of the hiring and pay practices of home builders."[61] The article also noted that the Labor Department was looking at other industries as well.

The *Lennar* court understandably found the two articles "unconvincing as evidence of Lennar's alleged wrongdoing" because the articles "provide no reportorial suggestion . . . that Lennar is engaged in wrongdoing" but "merely report that Lennar is one of many companies in many industries caught up in the dragnet of a federal investigation."[62] The court explained that to establish a credible basis to suspect

---

[58] 2012 WL 4760881 (Del. Ch. Oct. 5, 2012).

[59] Transmittal Aff. T. Leavengood Supp. Def.'s Opening Br. Supp. Mot. Summ. J. Ex. C, at 1, *La. Mun. Police Empls.' Ret. Sys. v. Lennar Corp*, No. 7314-VCG, Dkt. 9 (Del. Ch. May 1, 2012).

[60] *Id.*

[61] *Id.* Ex. D at 1.

[62] *Lennar*, 2012 WL 4760881, at *4.

wrongdoing, the articles needed to do more, such as by "directly implicat[ing] [Lennar] in wrongdoing."[63]

The Company also relies on the *Countrywide* case.[64] There, an article in the *Los Angeles Times* reported on a statistical study identifying the fortuitous timing of executive stock option grants at a number of companies, including Countrywide.[65] After seeing the article, the plaintiff hired an expect to run a statistical study on Countrywide's option grants and relied solely on the study to support a credible basis to suspect wrongdoing. The *Countrywide* court ruled for the plaintiff but remarked that the statistical study "would appear to be the outer limit" of the credible basis standard.[66]

The *Countrywide* comment addressed a single statistical study. Notwithstanding Twain's oft-repeated quip about "lies, damn lies, and statistics,"[67] a well-constructed statistical study can provide a strong evidentiary foundation for a credible basis to suspect wrongdoing. The statistical studies of option backdating in fact revealed considerable wrongdoing across multiple companies, largely driven by

---

[63] *Id.*

[64] *La. Mun. Police Empls.' Ret. Sys. v. Countrywide Fin. Corp.*, 2007 WL 2896540 (Del. Ch. Oct. 2, 2007).

[65] *Id.* at *2.

[66] *Id.* at *1.

[67] *See id.*; *accord* Mark Twain, *Chapters from My Autobiography* 471 (Project Gutenberg 2006) (1907), https://www.gutenberg.org/files/19987/19987-h/19987-h.htm (last visited Jan. 17, 2025).

law firm network effects.[68] The *Countrywide* comment simply means that a court must evaluate the reliability of the evidence presented in a given case, not that all statistical studies are out of bounds. To quote another famous aphorism, "In God we trust. All others must bring data." A good statistical study provides data.

The Company also cites *Thomas & Betts Corporation v. Leviton Manufacturing Company* to argue that news articles not corroborated by external evidence "lack independent guarantees of trustworthiness and are inherently unreliable."[69] *Thomas & Betts* is a seminal decision in Section 220 jurisprudence for its holding that a stockholder can rely on hearsay evidence that bears sufficient indications of reliability.[70] There, a corporate stockholder plaintiff relied on testimony from its own

---

[68] *See* Aharon Mohliver, *How Misconduct Spreads: Auditor's Role in the Diffusion of Stock-option Backdating*, 64 Admin. Sci. Q. 310, 320 (2019) (finding evidence of network effects in the spread of options backdating activity among auditors); Bert I. Huang, *Shallow Signals*, 126 Harv. L. Rev. 2227, 2242 nn.39–40 (2013) (describing a "contagion" aspect of the options backdating scandal); John M. Bizjak et al., *Option Backdating and Board Interlocks*, 22 Rev. Fin. Stud. 4821 (2009) (exploring the role of board interlocks in explaining the spread of option backdating). *See generally* Elizabeth Pollman, *Private Company Lies*, 109 Geo. L.J. 353, 386 (2020) (noting that fraudulent practices and the rationalization of fraud "seems to spread through business culture or competitive pressures"); Sarath Sanga, *Network Effects in Corporate Governance*, 63 J.L. & Econ. 1, 3 (2020) (using patterns of Delaware incorporation to demonstrate that network effects play a dominant role in generating trends in corporate governance); Todd Haugh, *The Power Few of Corporate Compliance*, 53 Ga. L. Rev. 129, 162–70, 180 n.275 (2018) (describing the role of network effects in normalizing criminal behavior and corporate compliance violations). The studies showed that a jurisdiction-evading contractual arrangement is easily copied and, with a judicial blessing, could spread rapidly.

[69] *See Thomas & Betts*, 681 A.2d at 1032.

[70] *NVIDIA,* 282 A.3d at 22 (citing *Thomas & Betts*, 681 A.2d at 1032–33).

employees about what an executive from the defendant corporation had said. The trial court declined to credit the testimony. The Delaware Supreme Court affirmed the trial court's decision, agreed that the testimony was hearsay, but explained that the testimony warranted rejection only because the hearsay declarant—a disaffected company insider—had a demonstrable financial incentive to distort the truth.[71] Unlike in *Thomas & Betts*, there is no evidence in the record in this case indicating that the news articles relied on demonstrably biased sources.[72] The Company's reliance on *Thomas & Betts* is unpersuasive.

---

[71] *Thomas & Betts*, 681 A.2d at 1032 ("[A]s the trial court found, [the insider] was actively engaged in the process of defecting to the [stockholder] camp. Statements made in this context lack independent guarantees of trustworthiness and are inherently unreliable.").

[72] Absent specific evidence in the record, well-known news publications generally do not have a financial incentive to favor a particular party. The news articles are therefore more persuasive evidence in general than motivated reports, even though both are hearsay. *See, e.g.*, *Haque v. Tesla Motors, Inc.*, 2017 WL 448594 (Del. Ch. Feb. 2, 2017) (acknowledging that "articles . . . written by independent news agencies" provide a better support than articles "by authors with a personal interest in swaying the public perception of the [c]ompany, such as short sellers"); *see generally Ethical Journalism: A Handbook of Values and Practices for the News and Opinion Departments*, N.Y. TIMES (June 20, 2024), https://www.nytimes.com/editorial-standards/ethical-journalism.html [hereinafter *NYT Handbook*] ("No staff member may own stock or have any other financial interest in a company, enterprise or industry that figures or is likely to figure in coverage that he or she provides, edits, packages or supervises regularly."). That said, even motivated reports may provide sufficiently reliable information. *See Jacob v. Bloom Energy Corp.*, 2021 WL 733438, at *1 n.10, *6 (Del. Ch. Feb. 25, 2021) ("[Even when authors of short reports contain interviews with anonymous experts and] "have incentives to spin financial analyses to suit their own investment strategies . . . such observations cannot and should not be construed as a declaration that all short reports, and all content within a short report, carry no probative weight as the court assesses the quantum of evidence supporting a stockholder's stated purpose for inspection.").

The Company's precedents bear no resemblance to the record in this case. The parties submitted forty-seven news articles.[73] Many are lengthy and detailed. Most are from reputable publications like the *Wall Street Journal*, the *New York Times*, the *Financial Times*, and *Bloomberg*. None reflect any indicia of unreliability, such as the motivated testimony in *Thomas & Betts*. The stockholder can rely on the news articles to establish a credible basis to suspect wrongdoing.

### b. The Anonymous Sources Issue

The Company also argues that news articles that rely on anonymous sources are not sufficiently reliable to support an inspection without "contemporaneous corroborative evidence . . . [or] indicia of reliability such as factual particulars, independent journalistic investigation, or descriptive information about these anonymous sources." AB at 21. That proposed rule would prevent stockholders from relying on most news articles, because many journalists rely on anonymous sources, and a journalist must protect the identity of an anonymous source.

The Company's argument fails initially because it seeks to address a category of evidence—newspaper articles that rely on anonymous sources—as a matter of law. But that is not how evidentiary determinations work. A trial court must weigh evidence and make factual findings. That includes evaluating the credibility of

---

[73] The record contains sixteen *Wall Street Journal* articles, four *New York Post* articles, four *New York Times* articles, three *Bloomberg* articles, three *Puck* articles, three *Variety* articles, two *Deadline* articles, two *Financial Times* articles, two *Reuters* articles, and one article each from *CBS News*, *CNBC*, *Los Angeles Times*, the *Hollywood Reporter*, the *Real Deal*, the *Wrap*, and the *Venture Capital Post*.

physical or documentary evidence. The trial court can also draw or decline to draw inferences. Evaluating evidence is a case-specific responsibility.[74]

Nor does the Company's argument makes sense in light of how reporters use confidential sources. A confidential source is "a person from whom a reporter obtained information by means of written or spoken communication or the transfer of physical objects," but whom the published story does not identify by name.[75] Journalists obtain critical information by granting sources anonymity. Delaware recognizes anonymous sources as a foundational aspect of the freedom of the press and the protections afforded under the First Amendment.[76] So does the Supreme Court of the United States, which has observed: "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. . . . It is plain that anonymity has sometimes been assumed for the most constructive purposes."[77]

News organizations put their reputations on the line when publishing articles that rely on anonymous sources, and they have internal policies regarding their use.[78]

---

[74] *Bank of N.Y. Mellon Tr. Co. v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

[75] *See* 10 *Del. C.* § 4320(5).

[76] *In re Opinion of the Justices*, 324 A.2d 211 (Del. 1974) (holding a proposed anti-anonymity law unconstitutional as applied to newspapers); *see also* Reporters' Privilege Act, 10 *Del. C.* §§ 4320–4326.

[77] *See Talley v. California*, 362 U.S. 60, 64–65 (1960).

[78] *See, e.g.*, Jill Abramson, *Talk to the Newsroom: The Use of Anonymous Sources*, N.Y. TIMES (June 9, 2008), https://www.nytimes.com/2008/06/09/business

Those policies typically permit reliance on anonymous sources only if the journalist believes the information is both newsworthy and credible. They typically require a supervising editor to know the name of the anonymous source. They also typically require approval from an even higher-ranking editor when an anonymous source is central to a story. If an anonymous source makes serious allegations, then the reporter must take copious notes. Editors conduct regular spot checks and vet sources' reliability. News organizations have other policies that govern how they refer to confidential sources to protect their identity, including a policy that requires minimizing factual particulars about a source to mitigate the risk of identification.[79]

News articles from reputable publications that rely on anonymous sources will generally be sufficiently reliable for a court to consider when assessing whether a

---

/media/09askthetimes.html; Phil Corbett, *Why does The New York Times Use Anonymous Sources?*, N.Y. TIMES (June 30, 2022), https://www.nytimes.com/article/why-new-york-times-anonymous-sources.html; *NYT Handbook, supra* note 72; *FT Editorial Code of Practice*, FINANCIAL TIMES, https://aboutus.ft.com/company/our-standards (click "Editorial Code" hyperlink) (last visited Jan. 17, 2025); *Vol. 32, No. 1: Anonymity*, WALL ST. J. (Feb. 5, 2019), https://www.wsj.com/articles/vol-32-no-1-anonymity-01557858290?msockid=19df8f62127c6ac42b6a9a5e136e6b35; *Guidelines* § 3.3.18, BBC, https://www.bbc.com/editorialguidelines/guidelines/accuracy/guidelines#3.3.17 (last visited Jan. 17, 2025); *About Us*, WALL ST. J., https://www.wsj.com/about-us?mod=wsjfooter (last visited Jan. 17, 2025); *see generally Ethics and Standards Policies*, PULITZER CENTER, https://pulitzercenter.org/about/ethics-and-standards-policies (last visited Jan. 17, 2025); Ethics & Journalism Initiative, *Best Practices: Anonymous Sources*, N.Y.U., https://ethicsandjournalism.org/resources/best-practices/best-practices-anonymous-sources/ (last visited Jan. 17, 2025); Editors' Code of Practice Committee, *The Editors' Codebook*, INDEPENDENT PRESS STANDARDS ORG., https://www.ipso.co.uk/editors-code-of-practice/the-editors-code-book/ (click "Editors' Code Book" hyperlink) (last visited Jan. 17, 2025) (explaining standards regulating UK press, including *Financial Times*).

[79] *See, e.g., supra* note 78.

stockholder has a credible basis to suspect wrongdoing. Doubtless there will be case-specific exceptions, but the possibility that a court could decline to rely on particular news articles in a given case does not warrant the Company's stark rule. Indeed, because of the prevalence of anonymous sources, the Company's rule would dramatically reduce the ability of stockholders to rely on news sources when seeking books and records. Investigative journalists have uncovered many serious instances of corporate fraud, often with the help of anonymous sources. Stockholders can generally rely on that work.

In this case, the parties proffered forty-seven news articles. A third of them came from the *Wall Street Journal*. The bulk of the rest came from other well-known news organizations like the *New York Post*, the *New York Times*, *Bloomberg*, the *Financial Times*, and *Reuters*. Those are reliable publications with strong editorial policies.

In addition to appearing in well-known and reputable publications, the articles in this case were written by experienced journalists. The authors include editors,[80] a

---

[80] *See* JX 16, JX 23, JX 26, JX 32, JXs 36–37, JX 40, JX 45, JX 47, JX 52, JX 57, JX 61, JX 63, JX 65, JX 70, JX 71, JX 75; *accord Jessica Toonkel*, WALL ST. J., https://www.wsj.com/news/author/jessica-toonkel (last visited Jan. 27, 2025); *Jill Goldsmith*, DEADLINE, https://deadline.com/author/jill-goldsmith/ (last visited Jan. 27, 2025); *Andrew Bary*, BARRON'S, https://www.barrons.com/authors/andrew-bary (last visited Jan. 27, 2025).

senior editor,[81] a bureau chief,[82] a co-editor-in-chief,[83] a winner of the *Financial Times* Business Book of the Year Award,[84] and a Pulitzer Prize finalist.[85]

The articles in the record that rely on anonymous sources use standard identifiers, such as "people close to the negotiations" or "sources briefed on the process." In an M&A setting like the one in this case, the individuals speaking to the reporters are often the parties' public relations firms, their investment bankers, and sometimes their lawyers. The sources can also be internal personnel, such as an in-house public relations person or someone from the investor relations department. The sources are not random people off the street. They are people who know what they are talking about.

The articles appear careful in their use of anonymous sources. Although the articles avoid disclosing factual particulars that could reveal the sources' identifes, the articles rely on the sources for specific pieces of information. They also reflect

---

[81] JX 26; *accord Gareth Vipers*, WALL ST. J., https://www.wsj.com/news/author/gareth-vipers?msockid=19df8f62127c6ac42b6a9a5e136e6b35 (last visited Jan. 27, 2025).

[82] JX 46; *accord Christopher Grimes*, FINANCIAL TIMES, https://www.ft.com/christopher-grimes (last visited Jan. 27, 2025).

[83] JX 15; *accord Cynthia Littleton*, VARIETY, https://variety.com/author/cynthia-littleton/ (last visited Jan. 27, 2025).

[84] JX 51, JX 58; *accord William D. Cohan,* https://williamcohan.com/about/ (last visited Jan. 27, 2025).

[85] JX 69; *accord Meg James*, L.A. TIMES, https://www.latimes.com/people/meg-james (last visited Jan. 27, 2025).

efforts to achieve precision to the extent possible. The Company often confirmed the information the sources provided in its SEC filings.[86] The Company itself relied on seven news articles in its pre-trial brief, including from the same publication and even the same journalist as the articles the Company found objectionable.[87]

The news articles in this case are sufficiently reliable to be considered and given weight when analyzing whether the stockholder has established a credible basis to suspect wrongdoing. The articles' use of anonymous sources does not undermine their persuasiveness.

## C. The Stockholder Has A Proper Purpose.

Based on the record, the stockholder has established a credible basis to suspect corporate wrongdoing. The evidence provides a credible basis to suspect that Redstone responded to market interest in the Company by diverting bidders to a parent-level transaction to the detriment of minority stockholders.

The Company tries to parse the record and negate individual aspects of the story. For example, the Company argues that the court cannot infer anything wrongful from a change in the Company's stock price. Whether a drop in the stock

---

[86] *See, e.g.*, JX 72 (announcing the two-step Skydance Deal confirming pre-announcement scoops); *id.* at 72 at '009, '014 (announcing the formation of the Special Committee); JX 48 at '004 (announcing Bakish's termination); JX 44 at '007, '018 (indicating the departure of the four directors).

[87] Dkt. 28 at 13 n.1 (citing JX 56, JX 63); *id* at 13–14 (citing JX 59 –61, JX 62); *id.* at 23 (citing JX 64). The Company cited news articles by *Variety*, *CBS News*, the *Hollywood Reporter*, the *Wall Street Journal*, the *New York Times*, *Deadline*, and *Reuters*, including a story by Jessica Toonkel, who authored most of the *Wall Street Journal* articles the stockholder relied on. *See* JX 61.

price seems probative depends on the reasons that parties provide, who bears the burden of proof, and the level of the burden imposed. Here, the court can credit that the stock price reacted to events in the deal process. The stockholder has offered a credible account and carried its burden of proof.

The Company also argues that the court cannot infer potential wrongdoing from the fact that NAI faced liquidity issues. Taking the evidence as a whole, the court can credit that liquidity issues could have affected Redstone's decisions and led her to seek a near-term sale of NAI rather than a Company-level transaction.

The Company also argues that the stockholder has failed to establish any motivation Redstone had to engage in wrongdoing. The stockholder does not have to prove motive. The stockholder has offered a credible account. Moreover, the record supports an inference that Redstone could extract more value from a sale of NAI than from a Company-level sale. It also supports an inference that Redstone steered the sale process to achieve that result.

The Company also argues that the court cannot infer wrongdoing from the directors' departures and the CEO's termination because they don't directly implicate Redstone. And the Company argues that the record does not support an inference that five directors left because the Skydance Deal only benefited Redstone. The court must consider the record as a whole. Considered against the backdrop of deal discussions, the market reactions to events in the deal process, and Redstone's position, these events are probative and support the inferences the stockholder seeks.

The Company also argues that the fact that Redstone walked away from the Skydance Deal is not connected to any purported misconduct. Taking the record as a whole, there is a credible basis to suspect that Redstone torpedoed the Company-level Skydance Deal because it would not provide her with the benefits she wanted.

Whether Redstone steered bidders for the Company away from a Company-level transaction and toward an NAI-level transaction is a legitimate topic for a Section 220 demand. The stockholder established a proper purpose by proving a credible basis to suspect corporate wrongdoing.

## III.    CONCLUSION

The stockholder has shown by a preponderance of the evidence that there is a credible basis to infer potential corporate wrongdoing in connection with the sale of NAI. The stockholder is entitled to obtain books and records that are both necessary and sufficient to fulfill its purpose. The parties have disputes on that issue, but the magistrate judge should address the scope of production in the first instance. The parties will submit an implementing order that will return this dispute to the magistrate judge for further proceedings.